Good morning, ladies and gentlemen. Our first case for argument this morning is Czarnecki v. Colvin, Mr. Schultz. May it please the Court, Your Honor, it's Barry Schultz on behalf of the plaintiff. Schultz, it seemed like I just saw you about a week or two ago. It was pretty recently. The ALJ in this case made multiple errors in her decision, including failing to weigh the opinions of the treating physicians and treating psychiatrists pursuant to the checklist of factors set forth in the regulations, in basing the credibility determination on improper inferences and mischaracterization of the record, in reaching an improper medical determination Ms. Czarnecki's need to use a cane for standing and walking. I'll start with the credibility errors. The ALJ found that activities such as climbing a ladder were inconsistent with Ms. Czarnecki's alleged limitations, but the ALJ knew that she had climbed the ladder because he saw that in a treatment note where the claimant had fallen off a ladder and had to go see her doctor because she injured herself. Similarly, the ALJ found that she stated that she had helped to remodel her house and that that was inconsistent with her alleged limitations. But similarly, the ALJ knew that she had engaged in that activity because she had to go see the doctor. Do we have any more details about what this remodeling activity was? There's no detail at all. The ALJ didn't discuss it at the hearing. She could have been sitting there picking up paint samples or she could have been ripping wallpaper off the wall. That's correct. But also at page 628 of the record, which is the doctor's treatment note, it appears that at that date that Ms. Czarnecki had undergone a medial branch block, which is anesthetizing at the facet joints, and she was feeling good for several hours. So it appears that that's when she engaged in this activity, after she had just had this office, again in severe pain, with the doctor recommending that she had to, or he was recommending epidural steroid injections at that point. And in the Scroggum v. Colvin case, a recent case from this court, specifically states that a claimant's ill-advised attempt to engage in activity during which they then injure themselves should not be used to undermine the claimant's credibility. I take it that the claim that you're pursuing is really kind of a claim that relies both on the back pain and the psychological condition. That's correct. You're not really pushing one or the other in isolation? That's correct. Because the claimant turned 50, if she was limited to a sedentary job as of the date of the ALJ's decision, she would have been found disabled based on the medical vocational guidelines, and so that's part of that aspect of the claim. But then in addition, her psychiatrist opined that she was disabled independently based on the mental panic disorder and depression. Right, because I'm trying to figure out how important this debate about whether the ALJ should have said something about the GAF score, given, as the Commissioner points out, and Well, the GAF score is still an opinion, even if the DSM-5 isn't using it. It still constitutes an opinion, and it really is just one other factor. I think it's significant in this case because the consultative examiner, the psychologist that the government sent the plaintiff to see, he gave a GAF score of 40. So while the DSM-5 might not be using it, the doctor still used it as providing his assessment of the claimant's functional capacity, and that GAF score is consistent then with the treating psychiatrist's opinion. And it's quite low. It's quite low. Yeah, 40 is quite low. She did have some GAF scores higher than that, though, didn't she? Yes. What was the highest GAF score she had? I think, well, the highest score that showed was a 75, but that was for the period prior to the alleged onset of disability. I think it was 50 was the highest, I believe, after her alleged onset of disability. The ALJ also found, plainly inconsistent with the alleged disability, the fact that Ms. Arnecki had worked as a waitress after her alleged onset date. But prior to that in the decision, at step one, the ALJ found that all of Ms. Arnecki's attempt to work after her alleged onset date constituted unsuccessful work attempts, which is a term of art defined in the regulations, meaning that Ms. Arnecki had to stop working because of her impairment. So it's internally inconsistent to find that she could not sustain that work because of Especially given the facts here, which are that in 2008 she worked part-time for six months and then had to quit the job. In 2009 she worked part-time for two to three months and then had to quit the job. And in 2010 she could only work for four days and then had to quit the job. Was that the same that was waitressing? Well, in 2008 and 2010 it was waitressing. That's correct. So it seems to me, summarizing the 50 some odd or 40 some odd pages of the governance brief, their position is that there were enough opinions in the record to show that when she was compliant with treatment and she was doing what she needed to do, she actually reached a pretty good level of functioning. So, I mean, obviously if it's a case where there's just differences of opinion, the ALJ is entitled to choose one. Well, I think it's more a case where the claimant had good and bad days. I mean, if you look at the treating psychiatrist's opinion, for example, there are times when she was experiencing anxiety, what he defined as near panic level, where she was sleeping very poorly, only a few hours a night, and she was irritable. And that was, I would say, at least half of the time. And then there were other times when she was doing well. But this court has noted that if half of the time the claimant is not doing well, then they probably can't sustain work activity. And that kind of gets to the question of how the ALJ treated the treating psychiatrist's opinion. First of all, the ALJ didn't even recognize that there was a treating psychiatrist. She says that the record contains an opinion from Pillars Community Mental Health. And then she goes on to say she's not giving it great weight. She doesn't mention Dr. Beresford by name. She doesn't mention that he's a treating psychiatrist. She doesn't mention that he'd been treating Ms. Zarnecki for three years by the time he gave his opinion. And those are all critical factors in the regulations to determine whether or not, how much weight to give to the treating doctor's opinion. So the ALJ didn't properly weigh that opinion. Then she gives great weight to the state agency psychologist's opinions. But just really on a conclusory basis, saying that their opinions are consistent with the record and they're well informed. These are just the people who read the record, right? People who read the record and never saw the claimant. That's correct. Yeah. I do want to just briefly mention the fact about the use of the cane. Dr. Maya prescribed a cane for the claimant stating that she needed it for standing and walking. And the ALJ stated, quote, I do not agree, close quote. And then she went on to say that the examinations and test results don't support the need for a cane. But the ALJ is not medically qualified to make that determination. And we do have evidence of spinal stenosis and moderate to severe degenerative disc disease throughout the lumbar spine.  And based on that, the treating physician said, I believe my patient needs to use a cane for standing and walking. The ALJ on her own can't just disagree with that. That's an improper independent medical determination. Thank you. Thank you. Ms. Siegel. Good morning, Your Honors. My name is Catherine Siegel. I represent the Commissioner of Social Security in this case. The ALJ here was faced with numerous and starkly inconsistent statements from the claimant that she had to weigh. And these inconsistencies reasonably shaped her view of the claimant's disability claim. What's inconsistent? I actually didn't see much inconsistent. And I was very bothered that the ALJ doesn't incorporate even the medical findings. We'll stay with the physical side for starters about the lumbosacral disease, the spinal stenosis. These are not a matter of opinion. She's got disc disease. She's got different things that logically could lead to the kind of pain she's talking about. Well, she does cite the MRI findings. But that's it. I mean, you know, there's so much more in the record that she never tells you why she thinks, you know, people with this long list of things wrong with them are actually fine or I don't see anything. Well, she's looking for an underlying basis for the claimant's allegations. Right. And she doesn't. Well, she says this is on page 8 of 14 of her opinion. She kind of lists off some of these things, degenerative joint disease of the lumbar spine, spinal stenosis, liver to scoliosis of the thoracolumnar spine, chronic obstructive pulmonary disease,  but all of this just gets rattled off, and she doesn't explain how she can say that this woman is functional on the drugs when she's constantly going to the doctors and saying she isn't. She does note the degree of stenosis as being very mild, which is consistent with the record. But that's not one. If that was the only thing that was wrong with her, perhaps, you know, maybe a lot of people have some stenosis. But it's not. There's a huge list of things, and the doctors are giving her epidurals. I mean, we look sometimes to see are the doctors responding to these complaints, because that gives you some sense that in their professional medical judgment there's really something there. She's getting the blocks and the epidural treatments, and they don't last very long. Well, there are a number of factors at play here. One of the things she's considering is the objective findings from the doctors. The doctors who treated her for her back condition, Dr. Mint and Dr. Merschad, both of them have normal findings with regard to neurological findings, normal gait. So what? Does that mean you don't have back pain? It means that it's not limiting your functioning. I mean, if you have a normal gait and you've got back pain, you're not limping, you're not using a cane, you're just walking. You're walking and it hurts a lot. That's what it means. Why do you have to limp if it hurts? Well, that's showing, that refers to the level of functional capacity. No, you're making a medical assumption that's completely unsupported in the record. I don't see why limping, which means that there's an asymmetrical pain, has anything to do with whether you can walk across the room without a limp or with pain. Why do people with pain limp? But she's saying that she can't even get out of bed. Without hurting, right? No, just to get help. Your husband helps her. She said that she can't get out of bed without her husband's help and that she can't even walk without holding on to something. That she suffered for five years struggling with walking and didn't use a cane during that period. She held on to things. Right, and is there any evidence that this was phony? Yes. Is there video evidence? Well, not video evidence, but I mean, she testifies that she worked for six to eight months as a waitress lifting 25 to 30 pound trays. But Mr. Schultz said that she failed at that. After six to eight months. But in year one, then it was shorter in year two, shorter yet? It was during that period. This is right in the middle of her claim period. She's working six to eight months, eight hours a day, three to four days a week. This is a long shift. This is not, you know, I'm working for an hour and then I quit because it's too hard for me to lift a tray. But we have cases that say when people are going the extra mile, we don't want to punish them for that. But that's something that the ALJ can consider when trying to determine whether she's credible. At one point, she's saying she's so limited that she can't even get out of bed without help. And on the other hand, she's showing up at work eight hours a day lifting trays of food and working for six to eight months. Well, there are levels of not being able to get out of bed with help, and then your muscles, as time passes for two or three minutes or five minutes, you can start moving normally. Right. Well, and the thing that is – I mean, that's not inconsistent with not being able to get out of bed and also working. Except that the claimant's portrayal of her symptoms is so much greater than what her activities and her objective findings in the actual doctor appointments that she's going to portray. In 2010, she's prescribed a cane, isn't she? Yes, and it was about a week before the hearing. And it had been recommended a year before that. The prescription comes about a year after the recommendation. But the prescription was actually – I mean, she actually had the cane at the hearing. And that was something that the ALJ observed. And the ALJ knows better than the doctor, I guess. The ALJ is trying to find an underlying basis for the cane use. And when she looks at the record, there are dozens of instances where she has a normal gait. And she doesn't complain about needing a cane. I mean, it's objective findings that she's trying to determine whether that cane use is something that's put on for the hearing and for effect, or whether it's something that she's actually using day to day. Well, people who use canes don't always need them. In this instance, she didn't even use it. I mean, when she's working as a waitress, she didn't say she was working with a cane. I understand that. But that doesn't mean that other times she needs a cane. And the ALJ's job here is to look at the record. She's got a bird's eye view of everything going on in this record. And she's weighing things that the claimant says and the activities that she has and the medical findings and the kind of treatment she's getting and the kinds of medications that she's using, whether she's using them according to what the doctor says. Using her own personal experiences? No, she's only using the opinions of these doctors who read the file. She's not using the opinions of a single examining physician, either for the state or for the private claimant. No, she cites evidence from Dr. Villanueva, who's the physical examining physician, and Dr. Wagner. Now, neither one of them gave an RFC assessment. Dr. Wagner, though, on the psychological side, supports the claimant, not the ALJ. Not really, because although that GAF score is 40, he's got under the findings, the objective findings, which is what the ALJ is relying upon, are normal. But they're not normal. I mean, what's the doctor supposed to say? I mean, he's put in a piece of data saying, this is my overall assessment of this person, GAF 40. This doctor didn't have a relationship with the claimant. He had no reason to skew his opinion in favor of this. I would actually assume he has a reason to skew it against the claimant, if anything. But when you look at the findings that he made on examination, things like the abstract thinking, whether she's able to do calculations, things that involve measurements of concentration, she's finding, or Dr. Wagner is finding. But that's not the totality of what GAF measures. No, right. So you can do serial sevens. Great. You know, you're a good subtractor. But I don't know why that tells you that the GAF is not reflective of her psychological condition. I didn't say it wasn't reflecting the psychological condition. I said it wasn't reflecting the functional capacity. This court's recognized that GAF does not relate to functional capacity. It's really used as a treatment tool for planning treatment by doctors. It's not used to make a functional capacity assessment, and that's one of the reasons why the ALJ shouldn't be required to address it. Not a word. I mean, it just seems crazy. I know that the profession has tried to move to a more precise methodology. That's great. I'm sure we'll see it in cases to come. And one of the things that demonstrates that it really isn't an accurate tool is the variations between the numbers that were given by Dr. Bier's score and the numbers that were given by Dr. Wagner, and their actual objective findings about her concentration abilities and things were all normal, and they're both coming at the same conclusion, not the objective findings, but then the scores are so wildly different. So you think you could be able to concentrate, and concentration means that you are psychologically capable of working. Well, in this instance where we're looking at concentration ability as something that might be limited. So you can concentrate even if you feel like you have to lie in bed all day because you're too depressed to get up, but you're really good at concentrating. I just don't know where the link is. Well, she was tested. I mean, they did a mental examination of her and tested that functioning. Yeah, yeah. I mean, I don't know what other way you would be measuring it objectively. I mean, unless you just are going to take all of the claimants' allegations at face value, whatever they say, I mean, there has to be an underlying basis that corroborates them, and that's what the ALJ was doing. She was going through the different factors, and she laid out her reasoning in very good detail about the credibility assessment and why she didn't think the claim was credible. All right, well, thank you very much. Anything further, Mr. Schultz? I just wanted to point out that while Ms. Arneke was prescribed epidural steroid injections, she had to actually stop using them because they cause excessive bleeding. And so they were treatments that she should have been taking to help her pain, but she couldn't take them because of the side effects that she had. The other thing is that the consulting psychologist, Dr. Wagner, he noted that the claimant was frequently crying during the examination and that she had a dysphoric mood or a depressed mood, and so that would have been part of the basis for his opinion. And even the consultative physical doctor, Dr. Villanueva, noted that the claimant had an abnormal gait, that her range of deflection was only 50% of normal, and that she was unable to heel or toe walk and had difficulty getting on the exam table. And those are things that in the commissioner's regulations show evidence of motor weakness. She has a clubfoot condition. She has a clubfoot condition, yes. So she couldn't have a normal gait, right? I believe that's probably correct, although there are times when doctors who examined her did not note an abnormal gait, but other times they did. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.